**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **K. KABASHA GRIFFIN-EL a/k/a** : | |
| **KEITH FEDELE GRIFFIN,** : | |
| **Plaintiff,** : | **Civil Action No. 06-2719** |
| : | |
| **v.** : | |
| : | |
| **JEFFREY A. BEARD,** *et al.* : | |
| **and JOHN AND JANE DOES 1-100,** : | |
| **individually and in their official capacity,** : | |
| **Defendants.** : | |

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
SANCTIONS BASED ON DEFENDANTS' SPOLIATION OF EVIDENCE**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ......................................................................................... 1

II.  FACTUAL BACKGROUND ........................................................................ 4

   A.   Mr. Griffin-El Is Fighting A Life Sentence. ..................................... 4

   B.   The August 4, 2005 Search and Seizure ........................................... 4

   C.   Mr. Griffin-El's Repeated Requests For The Return Of His Legal Materials.................... 9

   D.   Defendants' Response to Mr. Griffin-El's Requests for the Return
      of His Legal Materials. ................................................................... 13

   E.   Mr. Griffin-El's PCRA Petition is Dismissed for "Failure to File a Brief.".................... 18

   F.   Mr. Griffin-El Pursues Legal Action. ............................................. 18

   G.   Defendants Refused to Produce Documents to Mr. Griffin-El During Discovery. .......... 20

III. ARGUMENT ............................................................................................. 24

   A.   Standard for Spoliation of Evidence. .............................................. 24

   B.   Defendants Lost Or Destroyed Items That Were Seized From Mr. Griffin-El. ............... 25

      1.   *Defendants Had Exclusive Control Of All Of The Items Seized
         From Mr. Griffin-El.* ........................................................... 25

      2.   *Defendants Failed To Produce All Of The Items That Were
         Seized From Mr. Griffin-El.* ................................................. 25

      3.   *The Items Seized From Mr. Griffin-El Are Relevant To His Claims.* ............. 26

      4.   *It Was Reasonably Foreseeable That All Of The Items Seized From
         Mr. Griffin-El Would Be Discoverable.* ................................. 27

   C.   Defendants Destroyed The Video Recordings Of The Two Searches And Seizures. ...... 28

   D.   At A Minimum, The Spoliation Inference Is An Appropriate Sanction.......................... 29

      1.   *Defendants Willfully Spoliated Relevant Evidence.* ...................................... 29

      2.   *Mr. Griffin-El Has Been Severely Prejudiced By Defendants'
         Spoliation of Evidence.* ....................................................... 33

i

# TABLE OF CONTENTS
## (continued)

**Page**

    3.    *Sanctions Are Necessary To Avoid Substantial Unfairness To Mr. Griffin-El.* ............ 34

IV. CONCLUSION ........................................................................................................... 38

## TABLE OF AUTHORITIES

**Page**

Baliotis v. McNeil,
  870 F. Supp. 1285 (M.D. Pa. 1994) ...........................................................27

Brewer v. Quaker State Oil Ref. Corp.,
  72 F.3d 326 (3d Cir. 1995)...................................................................24, 25

Canton v. Kmart Corp.,
  No. 05-143, 2009 WL 2058908 (D.V.I. July 13, 2009)................................37

Centimark Corp. v. Pegnato & Pegnato Roof Mgmt., Inc.,
  No. 05-708, 2008 WL 1995305 (W.D. Pa. May 6, 2008) ...........................28

Chambers v. NASCO, Inc.,
  501 U.S. 32 (1991)......................................................................................24

Dowling v. United States Gov't,
  No. 2000-0049, 2008 WL 4534174 (D.V.I. Oct. 6, 2008).........................32

Erie Ins. Exch. *ex rel.* McCracken v. Applica Consumer Prods., Inc.,
  No. 02-1040, 2005 WL 1165562 (M.D. Pa. May 17, 2005).......................34

Mosaid Techs., Inc. v. Samsung Elec. Co.,
  348 F. Supp. 2d 332 (D.N.J. 2004) ............................................................35

Ogin v. Ahmed,
  563 F. Supp. 2d 539 (M.D. Pa. 2008).........................................24, 25, 27, 37

Paramount Pictures Corp. v. Davis,
  234 F.R.D. 102 (E.D. Pa. 2005)..................................................................34

Schmid v. Milwaukee Elec. Tool Corp.,
  13 F.3d 76 (3d Cir. 1994) ....................................................................24, 25, 29

Scott v. IBM Corp.,
  196 F.R.D. 233 (D.N.J. Sep. 27, 2000)........................................24, 27, 31

Telequest Int'l Corp, v. Dedicated Bus. Sys., Inc.,
  No. 06-5359, 2009 WL 690996 (D.N.J. Mar. 11, 2009) ...........................37

*In re* Wechsler,
  121 F. Supp. 2d 404 (D. Del. 2000).............................................................34

Williams v. Am. Surplus, Inc.,
  No. 02-7655, 2003 WL 22232882 (E.D. Pa. Aug. 4, 2003) .......................34

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Woodford v. Ngo,
548 U.S. 81, 95 (2006)...................................................................................................27, 35

**DOCKETED CASES**

Monroe v. Beard,
      No. 05-04937 (E.D. Pa.) .................................................................9, 15, 19, 27, 28, 32

**FEDERAL STATUTES**

The Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA").....................................18

## I.    __INTRODUCTION__

This case centers on Defendants' repeated disregard for the significance of the legal materials, documents, and property of Plaintiff Kabasha Griffin-El, an inmate serving a life sentence under the custody of the Pennsylvania Department of Corrections ("DOC").  On August 4, 2005, Defendants searched Mr. Griffin-El and his cell for approximately four hours and seized numerous documents, including legal documents Mr. Griffin-El needed to litigate the appeal of his life sentence.  Despite Mr. Griffin-El's repeated written and verbal requests to DOC officials, including Defendant David DiGuglielmo, Superintendent of the State Correctional Institute ("SCI") at Graterford, for the return of these seized documents, Defendants never returned any of the seized documents to Mr. Griffin-El.  Similarly, despite the numerous requests made by Mr. Griffin-El's counsel during discovery for Defendants to produce all of the documents seized from Mr. Griffin-El, Defendants have failed to do so.  Still further, Defendants have similarly ignored two Orders from this Court directing Defendants to produce all of the seized items.

This Motion is based upon Defendants' admission that they destroyed and lost documents in their sole custody and control.  Specifically, Defendants admit that a floppy disk that was seized from Mr. Griffin-El on August 4, 2005 and that Defendant John Moyer, a Lieutenant ("Lt.") in the Internal Security Department at SCI Graterford, testified was the primary purported reason for subjecting Mr. Griffin-El to a second search and seizure on May 5, 2006 – is now missing.  Defendants' only explanation as to the whereabouts of this key piece of evidence is that it *now* "cannot be located."

Also missing from Defendants' document production is a significant amount of the legal materials seized from Mr. Griffin-El that he identified five days after they were seized and that he needed to pursue the appeal of his life sentence.  There is no testimony or document that

contradicts the number or nature of items identified by Mr. Griffin-El prior to this litigation or his intended purpose for those legal materials.

Furthermore, Defendants admit that they destroyed recordings of video surveillance of the area outside of Mr. Griffin-El's cell during the August 4, 2005 and the May 5, 2006 searches and seizures. The video recordings would have further confirmed Mr. Griffin-El's arguments regarding who conducted the searches, how the searches were conducted, and what items were seized.

In keeping with the well-established rule of law in the Third Circuit, a party who has notice that evidence is relevant to litigation and who destroys evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the evidence. Mr. Griffin-El seeks sanctions against Defendants in the form of judgment or, at the very least, spoliation evidence and an adverse inference instruction. These sanctions are necessary to restore Mr. Griffin-El to the position in which he would have been without the spoliation, to admonish Defendants – state actors charged with the custody and care of inmates and their constitutional rights – for failing to preserve evidence relevant to an inmate's constitutional claims, and to send a clear message to prison officials that they cannot avoid liability in prisoner civil rights actions by simply destroying or losing evidence of their unconstitutional acts.

Spoliation sanctions are warranted here. It is undisputed that all of the materials seized from Mr. Griffin-El were at all times in the exclusive custody and control of Defendants from the moment they were seized to the present. Mr. Griffin-El, by and through his counsel as well as on his own, has requested repeatedly the production of all items seized by Defendants on August 4, 2005 and May 5, 2006. During discovery, Mr. Griffin-El was forced to seek repeatedly this

Court's intervention in his efforts to obtain these materials. This Court responded with two Orders directing Defendants to produce all items seized from Mr. Griffin-El on those dates, but Defendants have failed to do so. After Defendants produced an incomplete set of the seized items, Mr. Griffin-El flagged the issue of Defendants' apparent failure to comply with the discovery rules to this Court and also requested that Defendants be compelled to produce any litigation hold memoranda they had received. This Court responded by directing Defendants to "identify the existence of litigation hold memoranda or documents, the sender, and the date any such documents were received. The litigation hold documents themselves and the contents of said documents are not discoverable *absent a showing of spoliation on the part of Defendants*." Order dated August 25, 2009 (Docket No. 136) (emphasis added).

Defendants were put on notice of the legal significance of these items or should have reasonably foreseen that these documents would later be discoverable. Indeed, several of the Defendants and their counsel were involved in a civil lawsuit stemming from the same August 4, 2005 search and seizure that was filed just two months later.

Mr. Griffin-El will be severely prejudiced in the prosecution of his claims without this evidence, some of which cannot be replaced. For the reasons set forth below, Mr. Griffin-El respectfully requests that this Court: (1) enter judgment in favor of Mr. Griffin-El or, at the very least, find that Defendants spoliated evidence and grant Mr. Griffin-El an adverse inference instruction; and (2) order Defendants to produce litigation hold memoranda they received, if any, in keeping with this Court's prior Order dated August 25, 2009.

II.     **FACTUAL BACKGROUND**

A.      **Mr. Griffin-El Is Fighting A Life Sentence.**

On September 5, 1996, the Allegheny County Court of Common Pleas sentenced Mr. Griffin-El to a life sentence in the custody of the DOC.  Since then, Mr. Griffin-El has been fighting that sentence through various stages of appeal.

On or about June 24, 2002, Mr. Griffin-El filed a petition for relief pursuant to the Post Conviction Relief Act ("PCRA") in the Court of Common Pleas for Allegheny County. Transcript of the deposition of Kabasha Griffin-El, the cited portions of which are attached hereto as Ex. 1,[1] at 14; June 24, 2002 Motion for Post Conviction Collateral Relief, attached hereto as Ex. 2.  While Mr. Griffin-El's PCRA petition was pending, the events that gave rise to this lawsuit occurred at SCI Graterford,[2] beginning with a search and seizure that took place on August 4, 2005.  Ex. 1 at 22.

B.      **The August 4, 2005 Search and Seizure**

On August 4, 2005, Defendants Thomas Scarpati and Earl Thomas, both Corrections Officers ("CO") at SCI Graterford, entered Mr. Griffin-El's cell, strip searched him, handcuffed him to the door of the cell, then proceeded to search his cell for four hours.  Ex. 1 at 31-33.  COs Scarpati and Thomas went through each box of documents in his cell.  Id. at 32.  They read his confidential legal materials, even though Mr. Griffin-El told them they were reading his legal materials and that it was illegal for them to do so.  Id.  COs Scarpati and Thomas set aside documents that they were seizing, including Mr. Griffin-El's legal materials.  Id. at 32-33.  Mr. Griffin-El told them that some of these were court documents and that he "needed them for [his]

---

[1]    References to "Ex." herein shall refer to exhibits attached to this Memorandum of Law. References to "Exh." herein shall refer to exhibits used in depositions.

[2]    In November 2008, Mr. Griffin-El was transferred from SCI Graterford to SCI Greensburg. See Ex. 1 at 126-27.

ongoing appeals."  Eventually, another unidentified CO came to Mr. Griffin-El's cell after other

cells had been searched on the cell block, and loaded "two boxes and one huge bag" onto a cart

that they rolled off the block.  Id. at 33; see Transcript of the deposition of Earl Thomas, the cited

portions of which are attached hereto as Ex. 3, at 90-92.

      The only "receipt" that Mr. Griffin-El received for this seizure of his property and legal

materials was a confiscation slip that listed "2 boxes" and "1 bag."  Ex. 1 at 35-36, Griffin-El

Dep. Exh. 2, attached hereto as Ex. 4.  The confiscation slip does not describe with any degree of

specificity what was taken, only that materials amounting to "2 boxes" and "1 bag" were in fact

seized. Ex. 1 at 36; Ex. 4.  Although CO Thomas admits that his signature appears on the slip,

he denied that he completed the slip.  Ex. 3 at 107-13.  In fact, neither CO Scarpati nor CO

Thomas could identify the handwriting on the confiscation slip.  Transcript of the Deposition of

Thomas Scarpati, the cited portions of which are attached hereto as Ex. 5, at 34-35; Ex. 3 at 107-

13.  Several of the prison officials who may have completed the receipt or reviewed it, or were

present during the seizure, admit that the confiscation slip lacks sufficient detail to convey what

was taken from Mr. Griffin-El.  Ex. 5 at 35; Ex. 3 at 114-15; Transcript of the deposition of John

Moyer, the cited portions of which are attached hereto as Ex. 6, at 165

      The only explanation regarding the August 4, 2005 search and seizure that COs Scarpati

and Thomas provided Mr. Griffin-El at the time was that they were under orders and that they

were given a list of items to seize related to the Uniform Commercial Code ("UCC").  Ex. 1 at

33.  The only training that CO Thomas received about the UCC was on the morning of the search

from a briefing conducted by Lt. Moyer that lasted for a "few minutes."  Ex. 3 at 56-57.  During

this briefing, CO Thomas received a list of titles of books to look for (Ex. 3 at 65-66), but he

admits that he does not remember if he saw any sample UCC documents during this training.

Ex. 3 at 96-98.  CO Scarpati, however, does not even recall this briefing and candidly admits that "I'm not familiar with UCC anything, I don't even know what it is."  Ex. 5 at 37.

Lt. Moyer admits that this briefing took place in a "limited amount of time" on the morning of the August 4, 2005 UCC search.  Ex. 6 at 154.  Lt. Moyer also admits that he himself has not received any training related to the UCC, let alone any legal training.  Ex. 6 at 39-40.  Moreover, Lt. Moyer further admits that documents and materials unrelated to the UCC were seized from inmates during the August 4, 2005 UCC search.  Ex. 6 at 119.

A few days later, on August 10, 2005, Defendant Michael Lorenzo, Deputy Superintendent for Internal Security, distributed a memorandum (the "Lorenzo Memorandum," attached hereto as Ex. 7) to certain prison officials and approximately forty inmates, including Mr. Griffin-El, who had items seized from them during the August 4, 2005 UCC search.  Transcript of the Deposition of Michael Lorenzo, the cited portions of which are attached hereto as Ex. 8, at 50; Ex. 7.

The Lorenzo Memorandum was prepared to inform the inmates of the reason for the August 4, 2005 UCC searches and seizures, to inform them that they were under investigation for "filing UCC liens," to inform them of what recourse they had, and to notify them that "any legal documents that were unwittingly confiscated and not related to the UCC investigation will be returned to you."  Ex. 8 at 50-52, 54; Ex. 7.

It is undisputed that at the time of the search, Mr. Griffin-El had "accumulated at least ten years worth of research notes, prepared legal strategies in the form of notes and draft briefs and memorand[a] to the courts.  [In addition,] [t]here were medical records associated with [his] claims," all of which were seized by Defendants during the August 4, 2005 UCC search.  Ex. 1 at 50.

Non-UCC legal documents should have been returned to the inmates from whom they were seized. Ex. 8 at 53, 54, 59. In fact, Superintendent DiGuglielmo admits that each inmate affected by the August 4, 2005 seizure should have been afforded two opportunities to allow "the inmates [to] identify which documents they thought were inappropriately seized." Transcript of the Deposition of David DiGuglielmo, the cited portions of which are attached hereto as Ex 9, at 112. Mr. Griffin-El, however, never received one. Ex. 1 at 50-51.

According to Superintendent DiGuglielmo, in the prison context, inmates have used the UCC to file liens against prison officials and employees. Ex. 9 at 27-28. In response, the DOC, including SCI Graterford, began searching for UCC and UCC-related documents and seizing these documents from inmates so that they could not be used for purposes of imposing more liens. Id. Prior to the August 2005 searches and seizures, the DOC issued instructions to confiscate all UCC-related materials as contraband, *unless* the inmate could demonstrate a legitimate business purpose for having those materials. Id. at 9 at 29; Ex. 8 at 19-20. Specifically, on July 20, 2005, Defendant John Shaffer, Executive Deputy Secretary of the DOC, issued a confidential memorandum to Superintendents, security officers, and other prison officials instructing them to please "investigate inmates whom you believe may be engaged in any of the various stages of copyrighting their names . . . or filing UCC liens." Ex. 9 at 54-55; DiGuglielmo Dep. Exh. 4, attached hereto as Ex. 10.

After receiving the Shaffer memorandum, Deputy Lorenzo assigned Lt. Moyer the responsibility of handling UCC issues at SCI Graterford. Ex. 8 at 55. Previously, Lt. Moyer had submitted two intelligence reports to Deputy Lorenzo regarding UCC issues. Ex. 6 at 56-57, 75-76; Moyer Dep. Exh. 3, attached hereto as Ex. 11; Moyer Dep. Exh. 4, attached hereto as Ex. 12. In the contemporaneous intelligence reports and during his deposition years later, however, Lt.

Moyer admitted that his knowledge and understanding of the UCC was limited.  Ex. 6 at 39-40;

Ex. 12; Moyer Dep. Exh. 5, attached hereto as Ex. 13.

Yet, Deputy Lorenzo instructed Lt. Moyer to formulate a plan to seize UCC-related

materials from inmates.  Ex. 6 at 93.  Lt. Moyer chose the date for the search, selected a search

team, and compiled an information packet to distribute to the search team.  Id. at 94.  On the

morning of the search, the search team COs were assigned to report to the muster room, where

Lt. Moyer briefed them and "gave them instructions on what to look for, what the operation

would entail, gave them specific inmates who they were going search, their block location, and .

. . provided each search team with a packet of examples of the types of materials that we were

looking for."  Id. at 98.  The entire briefing lasted "[a]pproximately half [an] hour, 45 minutes."

Id. at 100.  The search team COs received no other instructions or training on how to identify

UCC documents.  Id. at 100-01.  Two COs were assigned to each search team, and the search

started shortly after the noon count.  Id. at 100.  Ultimately, approximately 45 to 50 inmates,

including Mr. Griffin-El, were subjected to the August 4, 2005 UCC searches and seizures.  Id.

at 101.

Lt. Moyer testified that approximately fifty file boxes of documents were seized on

August 4, 2005.  Ex. 6 at 115.  Lt. Moyer and another CO, Lt. Owens, removed the material from

the bags and placed them into boxes.  Id. at 137.  Neither Lt. Moyer nor Owens, however, made

an inventory of the seized materials at that point because there was "[t]oo much material."  Id. at

137.  All of these seized items were initially stored together in the interview room in the Internal

Security Department.  Id. at 130.  A few days later, Lt. Moyer, with the help of a few COs,

placed all of the materials in a cart and moved them to an empty cell in K block.  Id. at 132.  It is

undisputed that all items seized from Mr. Griffin-El were placed in Defendants' exclusive

custody and control.  Moyer's Response to Plaintiff's Third Set of Interrogatories at No. 8, attached hereto as Ex. 14.

The DOC issued a bulletin on August 30, 2005 announcing the UCC policy as an amendment to policy number DC-ADM 803-3.  Ex. 8 at 22; Lorenzo Dep. Exh. 1, attached hereto as Ex. 15; Transcript of the deposition of Jeffrey Beard, the cited portions of which are attached hereto as Ex. 16, at 27-28.  The UCC policy was not announced until after the August 4, 2005 search.  Ex. 6 at 136-37.  It was not against policy for inmates to possess UCC materials prior to this search, so none of the inmates from whom items were seized during that search were disciplined.  Id.  After the policy was announced, however, inmates found to possess UCC materials were disciplined with misconducts.  Ex. 8 at 19-20; Ex. 6 at 212.  In addition, the DOC instructed the mailroom of this policy to ensure that no new UCC documents were received by or distributed to inmates.  Ex. 8 at 21, 23.

On October 17, 2005, fifteen inmates – not including Mr. Griffin-El – filed a complaint against Lt. Moyer and other SCI Graterford officials as a result of the August 4, 2005 UCC searches and seizures to challenge the constitutionality of the UCC policy.  See Monroe v. Beard, No. 05-04937 (E.D. Pa.).  Each of the Monroe plaintiffs were offered two opportunities to review **all** of their seized materials.  Ex. 9 at 113-14; Ex. 6 at 119, 179.  Mr. Griffin-El, by contrast, did not receive one.  Ex. 1 at 50.

### C.      Mr. Griffin-El's Repeated Requests For The Return Of His Legal Materials

Five days after the August 4, 2005 search, Mr. Griffin-El sent Superintendent DiGuglielmo a written inmate request for the return of the "legal materials" that were seized on August 4, 2005.  Ex. 9 at 131-34; DiGuglielmo Dep. Exh. 11, attached hereto as Ex. 17; Ex. 1 at 37-38; Griffin-El Dep. Exh. 3, attached hereto as Ex. 18.  In this request, Mr. Griffin-El complained that the confiscated items receipt he received for the August 4, 2005 seizure did "not

provide an accurate and true accounting of the numerous affidavits, evidence in the form of legal

and official documents, petitions, case law, records, medical records, bank/credit union

Statements of Account, tax records, bills, receipts/proof of purchase, legal reference books,

literature, personal letters, religious material, legal strategy in the form of personal notes, inmate

handbook – rules and regulations of the DOC, Durable Power of Attorneys, and other items."

Ex. 18 at 1-2.

      In the August 2005 request, Mr. Griffin-El went on to inform Superintendent

DiGuglielmo that the "seizure of my legal notes, documents, books and materials is tantamount

to obstruction of justice.  The [] seizures were tactics of intimidation and harassment employed

against me in response to my lawful and legal pursuit of freedom, justice and access to the

courts."  Id. at 2.

      Mr. Griffin-El also spoke to Superintendent DiGuglielmo in person whenever Mr.

Griffin-El saw Superintendent DiGuglielmo in the school or law library to follow up on his

written inmate request.  Ex. 9 at 148-49.  Mr. Griffin-El, however, received no response to this

inmate request for nine months until May 2006.  Ex. 1 at 136-37.  And to this day, the documents

and materials seized from Mr. Griffin-El have not been returned.

      Between August 9, 2005 (when Mr. Griffin-El's legal materials were seized) and May

2006 (when Mr. Griffin-El received the first response to his inmate requests), the Allegheny

County Court of Common Pleas issued a Notice of Intention to Dismiss Mr. Griffin-El's PCRA

petition.  October 4, 2005 Notice of Intention to Dismiss, attached hereto as Ex. 19.  On or about

November 3, 2005, Mr. Griffin-El filed a Motion for Extension of Time to File Petitioner's

Reply to the Notice of Intention to Dismiss.  November 3, 2005 Motion for Extension to File

Reply, attached hereto as Ex. 20.  In this Motion, Mr. Griffin-El requested a sixty-day extension

and informed the court that Defendants Scarpati and Thomas had seized his legal documents and materials relating to his PCRA filings and that these materials had not yet been returned to him. Id. ¶ 10, 12, 20.  Mr. Griffin-El further pled that "[t]o force Petitioner to adhere[] to the Court's Order of October 4, 2005 without the necessary materials mentioned herein [his seized legal materials] would be tantamount to denial of right to defend against the counterclaims of the prosecution. . . ." Id. ¶ 20.  Accordingly, Mr. Griffin-El asked the court for an order "directing the [DOC] to turnover all seized legal documents, references and notes which were seized from Petitioner on [August 4, 2005] so that Petitioner may properly respond to the Court's notice of Intention to Dismiss. . . ." Id. at 5.  On November 25, 2005, the PCRA trial court issued an Order denying Mr. Griffin-El's PCRA petition.  November 25, 2005 Order, attached hereto as Ex. 21.  Mr. Griffin-El filed an appeal on December 23, 2005 to the Pennsylvania Superior Court.  December 23, 2005 Notice of Appeal, attached hereto as Ex. 22.

While his PCRA appeal was pending in the Superior Court, on January 9, 2006, having received no response to the August 9, 2005 inmate request or his verbal inquiries, Mr. Griffin-El sent another inmate request to Superintendent DiGuglielmo, in which he again notified Superintendent DiGuglielmo that he was "litigating [his] criminal case and . . . presently engaged in a very critical and crucial stage of the Post Conviction Relief Act Proceedings[;] it is paramount that my materials be returned as soon as possible."  Ex. 9 at 145-46; DiGuglielmo Dep. Exh. 12, attached hereto as Ex. 23.  Mr. Griffin-El also wrote: "To date, I have received no response to my Complaint [dated August 9, 2005]. . . ." Id.  Mr. Griffin-El further wrote that "[a]s of this date, none of my materials have been returned to me, despite the fact that the majority of the materials seized have nothing to do with the [UCC]." Id.

Having received no response to either the August 9 or the January 9 written inmate requests, Mr. Griffin-El sent Superintendent DiGuglielmo yet another written inmate request on January 20, 2009.  Ex. 9 at 152-54; DiGuglielmo Dep. Exh. 13, attached hereto as Ex. 24; DiGuglielmo Dep. Exh. 13A, attached hereto as Ex. 25.  In the January 20 request, Mr. Griffin-El stated that "[a]s of this date, I have not received an answer to the memo [dated January 9, 2006]."  Ex. 9 at 152-54; Exs. 24-25.  Mr. Griffin-El repeated that "I am presently litigating my criminal case and am presently engaged in a very critical and crucial stage of the Post Conviction Relief Act Proceedings[;] it is paramount that my materials be returned as soon as possible." Exs. 24-25.

In addition to his three written inmate requests, Mr. Griffin-El also spoke to Superintendent DiGuglielmo in person about his seized legal materials on a number of occasions. Ex. 9 at 148-49; 156-58.  On or about May 1, 2006, Mr. Griffin-El saw Superintendent DiGuglielmo in the hallway and asked him "once again if he would answer my request and provide me with my documents that I needed for court."  Ex. 1 at 77-78; 136-37.

Superintendent DiGuglielmo instructed his assistant, "Jen: Talk to Lt. Moyer.  See what property if any he still has. . . ."  Ex. 25.  On March 9, 2006, a secretary in Superintendent DiGuglielmo's office sent Lt. Moyer an email referencing Mr. Griffin-El's January 20 inmate request and advising Lt. Moyer that the "Superintendent asked me to check to see what property, if any, you still have of his."  Ex. 6 at 179-83; Moyer Dep. Exh. 14, attached hereto as Ex. 26. Lt. Moyer responded that "I have it and I have not had a chance to go thru it; I'll go thru it and call him down next week."  Id.  Lt. Moyer did not call Mr. Griffin-El down the next week.  Id. Rather, he called Mr. Griffin-El "when [Lt. Moyer] got around to it" two months later.  Id.

**D.     Defendants' Response to Mr. Griffin-El's Requests for the Return of His Legal Materials.**

On May 3, 2006, nearly nine months after Mr. Griffin-El's legal materials were seized, Superintendent DiGuglielmo finally responded to Mr. Griffin-El for the first time in a memorandum that Lt. Moyer also received.  Ex. 9 at 159-60; DiGuglielmo Dep. Exh. 14, attached hereto as Ex. 27; Ex. 1 at 137; Ex. 6 at 183-84; Moyer Dep. Exh. 15, attached hereto as Ex. 28.  Superintendent DiGuglielmo informed Mr. Griffin-El that "I discussed your concerns with Lt. Moyer.  He indicated that he has some property that is UCC related and considered unauthorized.  He may be taking further action with you and will follow up on your request." Ex. 27.  According to Superintendent DiGuglielmo, when he previously spoke to Lt. Moyer, Lt. Moyer said that he would be giving Mr. Griffin-El a misconduct "[n]ot specifically for the UCC redemption materials, but the other materials that they had showed [Mr. Griffin-El] trying to run a business enterprise, the disk that they had confiscated."  Ex. 9 at 159-60.  Lt. Moyer testified that he believed the disk contained evidence that Mr. Griffin-El was operating a business in violation of DOC policy.  Ex. 6 at 189.

Two days later, on May 5, 2006, two COs escorted Mr. Griffin-El from his cell to an interview room in the Internal Security department to meet with Lt. Moyer.  Ex. 1 at 79-80.  Lt. Moyer entered the room and asked Mr. Griffin-El if he was running a business, and Mr. Griffin-El said no.  Id. at 81.  Lt. Moyer, however, kept asking over and over again, and Mr. Griffin-El repeated that he was not running a business.  Id.

Lt. Moyer than asked Mr. Griffin-El, "do you want your stuff," and pointed to a single box on the end of the table.  Id. at 82.  Mr. Griffin-El went to look in the box, but it had nothing but empty folders in it.  Id. at 82.  Lt. Moyer said, "that's what you can have." Id.  Mr. Griffin-El requested a complete inventory of everything that was being offered to him.  Id. at 82-83.  Mr.

13

Griffin-El never received that list, the box of empty folders, or any of the items seized on August 4, 2005.  Id. at 82-83.

Lt. Moyer then pulled out a floppy disk, slapped it on the table, and asked what was on the disk.  Ex. 1 at 82.  Mr. Griffin-El explained that it contained documents that were seized from him.  Id.  Lt. Moyer then asked Mr. Griffin-El for the password to documents on the disk that were protected, and Mr. Griffin-El replied that he no longer remembered the password as more than nine months had passed since the disk was seized from him.  Id. at 82.

Eventually, Lt. Moyer became even angrier, slammed his hands on the table, began walking out of the room, and said, "we're going to see what else you got up there."  Id. at 82-83.  Lt. Moyer ordered Defendants Jason Dombrosky and Ronald Quick, both COs, to search Mr. Griffin-El's cell.  Id.

COs Dombrosky and Quick escorted Mr. Griffin-El back to his cell, strip searched him, searched his cell for approximately three-and-one-half hours, read every piece of paper in his cell, and seized more of his property.  Id. at 84-85.  Typically, the COs on the search team complete the confiscation slips.  Transcript of the deposition of Jason Dombrosky, the cited portions of which are attached hereto as Ex. 29, at 54-55.

For the May 5, 2006 seizure of Mr. Griffin-El's property, however, Lt. Moyer – who was not part of the search team – deemed it necessary to prepare confiscation slips.  Ex. 6 at 202; Ex. 29 at 54-55, 104-05; Dombrosky Dep. Exh. 6, attached hereto as Ex. 30.  While CO Dombrosky prepared some of the confiscation slips, this is the only instance that he could recall where a CO who was not part of the search team completed the confiscation slips.  Ex. 1 at 87; Ex. 29 at 54-55, 102-04; Ex. 30.  Lt. Moyer's confiscation slips, unlike the one slip for the August 4, 2005 seizure, spanned nine receipts.  Ex. 30; Griffin-El Dep. Exh. 8, attached hereto as Ex. 31.

SCI Graterford conducts video surveillance of the areas outside of each prisoner's cell. Ex. 6 at 207-10.  The recordings reflect persons who enter and leave the cell and what visible items they have with them.  In addition to COs Dombrosky and Quick, there was a third CO who participated in the May 5, 2006 search and seizure, but Mr. Griffin-El does not know this CO's name.  Ex. 1 at 86.  CO Quick testified that he does not even recall searching Mr. Griffin-El's cell.  Transcript of the deposition of Ronald Quick, the cited portions of which are attached here to as Ex. 32, at 28-29.

Lt. Moyer testified that the prison keeps recordings of this video surveillance for 90 days before the tapes are recorded over.  Ex. 6 at 207.  Defendants' counsel admits that the surveillance video of the area immediately outside of Mr. Griffin-El's cell from both the August 4, 2005 and May 5, 2006 searches and seizures have been destroyed.  July 17, 2009 e-mail from B. Smith to J. Lee, attached hereto as Ex. 33.

Lt. Moyer admits that he was aware that at least one other inmate who was a target of the August 4, 2005 searches, inmate Salim Hickman, had a padded envelope filled with floppy disks seized on that day.  Ex. 6 at 204-06.  Lt. Moyer, however, did not review Hickman's disks.  Id. He did not assign anyone else on his staff to review the disks.  Id.  In fact, he did not discipline Mr. Hickman for possessing these disks.  Id.  Mr. Hickman was involved in litigation against Lt. Moyer in the Monroe matter.

Mr. Griffin-El, however, received a misconduct report from Lt. Moyer allegedly stemming, in essence, from the floppy disk.  Ex. 6 at 186-87, 211; Ex. 1 at 89; Griffin-El Dep. Exh. 9, attached hereto as Ex. 34.  Due to this misconduct, Mr. Griffin-El was placed into prehearing confinement, sanctioned with ninety days in the Restricted Housing Unit – commonly known as the "hole" (the "RHU" or "hole"), lost his prison job as a tutor in the prison school,

and the additional seizure of more of his property.  Ex. 1 at 92-94; Griffin-El Dep. Exh. 11,

attached hereto as Ex. 35; Transcript of the deposition of Mary Canino, the cited portions of

which are attached hereto as Ex. 36, at 100; Canino Dep. Exh. 2, attached hereto as Ex. 37.  In

the hole, Mr. Griffin-El was required to stay in his cell 23 hours a day and permitted no

telephone calls or visits.  Second Amended Complaint (Docket No. 51) ¶ 60.

Notably, Mr. Griffin-El was not charged with running a business in violation of DOC

policy, and was not disciplined for running a business.  Ex. 34.

This is the only misconduct Mr. Griffin-El received during the nearly eight years of his

incarceration at SCI Graterford.  Ex. 1 at 144-45.  According to Defendants, inmates serving a

life sentence who demonstrate good behavior are placed in a single cell.  Defendants' Response

to Plaintiff's First Set of Interrogatories No. 13, attached hereto as Ex. 38.  These inmates,

however, forfeit single cell status if they are found guilty of a misconduct.  Id.  Mr. Griffin-El, an

inmate serving a life sentence, had a single cell status (e.g., "z code status") since September 31,

1997, but lost it after being charged by Lt. Moyer with a misconduct.  Ex. 1 at 123-24; Transcript

of the deposition of Sylvia Pallott, the cited portions of which are attached hereto as Ex. 39, at

65-66, 71, 79-80; Pallott Dep. Exh. 1, attached hereto as Ex. 40

Dr. Gregory Estadt, a licensed psychologist who treated Mr. Griffin-El at SCI Graterford

for, among other things, post-traumatic stress disorder, sent Lt. Moyer and Mr. Griffin-El's unit

manager an email on May 17, 2006.  Transcript of the deposition of Gregory Estadt, the cited

portions of which are attached hereto as Ex. 41, at 6-9, 12-15, 64-65; Estadt Dep. Exh. 4,

attached hereto as Ex. 42; Ex. 6 at 220-25; Moyer Dep. Exh. 18, attached hereto as Ex. 43.  Dr.

Estadt reported that Mr. Griffin-El "presents as very angry and frustrated" and advised that "a z-

code should be considered with this guy.  From a treatment standpoint, his [legal] materials should be returned to him as soon as possible."  Ex. 42.

Lt. Moyer, who has no education beyond high school and is not a police officer (nor has he ever served as a police officer), a doctor, a psychologist, or a psychiatrist, replied that "I would be angry too if the police discovered that I had single cell in population, caught a misconduct, lost my job in the school where I was able to facilitate my business ventures, and sent to the RHU and placed in a double cell.  This is the Inmates' fault, not ours[,] and he should not be catered to; it appears that he is manipulating to get single cell status; if he begins to act out then appropriate measures can be taken at that time!"  Ex. 6 at 13; 222-24.

As another result of receiving this misconduct, Mr. Griffin-El's custody level – which determines certain rights and privileges of inmates – was raised from level 3 to 4.  Transcript of the deposition of Robert Lund, the cited portions of which are attached hereto as Ex. 44, at 31; Ex. 39 at 77-79; Ex. 40.  One consequence of having a custody level at 4 is that Mr. Griffin-El was not eligible for jobs in the school, but only janitorial jobs on the block.  Ex. 9 at 199-201.

Although Mr. Griffin-El appealed his alleged misconduct and requested a reduction of time, he served the entirety of his ninety day disciplinary custody in the hole.  Transcript of the Deposition of William Banta, the cited portions of which are attached hereto as Ex.45, at 49; Banta Dep. Exh. 4, attached hereto as Ex. 46, at 8-17; Transcript of the Deposition of Francis Feild, the cited portions of which are attached hereto as Ex. 47, at 43-45.  The Program Review Committee ("PRC"), which conducts periodic reviews of inmates confined in the RHU, held a review meeting for Mr. Griffin-El on August 2, 2006.  Ex. 45 at 52-53; 57-58.  At this review meeting, Defendant William Banta, the unit manager for the RHU unit where Mr. Griffin-El served his disciplinary time for the misconduct, told Defendant Francis Feild, who was also a

17

member of the PRC, that Mr. Griffin-El was "one of those UCC guys."  Ex. 1 at 133.  During the

same meeting, Feild then called Lt. Moyer on the phone, and told Mr. Griffin-El that Lt. Moyer

was not yet finished reviewing his property and needed more time.  Id.; Ex. 47 at 45-46; Feild

Dep. Exh. 5, attached hereto as Ex. 48, at DG-EL00000725.  At this point, nearly a year had

passed since Mr. Griffin-El's documents were seized.  The PRC decided that Mr. Griffin-El

would remain in the RHU "pending the results of Lt. Moyer's investigation" even after the

ninety day disciplinary time that Mr. Griffin-El received as discipline for the misconduct had

expired.  Ex. 1 at 133-34; Ex. 45 at 59-60.

### E.     Mr. Griffin-El's PCRA Petition is Dismissed for "Failure to File a Brief."

The only response that Mr. Griffin-El received to his multiple requests for the return of

his legal materials relating to his PCRA petition was the May 3, 2006 memorandum from

Superintendent DiGuglielmo, the interrogation by Lt. Moyer on May 5, 2006, and the resulting

search, seizure, and discipline.  Defendants never returned any of the items that were seized from

Mr. Griffin-El and never gave him a single opportunity to review all of the materials that were

seized from him.  On November 20, 2006, the Superior Court dismissed Mr. Griffin-El's PCRA

appeal "for failure to file a Brief."  November 20, 2006 Order Dismissing Appeal, attached

hereto as Ex. 49.

### F.     Mr. Griffin-El Pursues Legal Action.

On May 16 and 19 of 2006, while he was in the hole, Mr. Griffin-El submitted two

grievances regarding the two searches and seizures.  Transcript of the Deposition of Wendy

Shaylor, the cited portions of which are attached hereto as Ex. 50, at 35-38; Shaylor Dep. Exh. 4,

attached hereto as Ex. 51; Shaylor Dep. Exh. 5, attached hereto as Ex. 52.  The Prison Litigation

Reform Act, 42 U.S.C. § 1997e ("PLRA"), requires inmates to exhaust their administrative

remedies before they pursue relief from the courts.  Defendants admit that they received both

grievances.  Ex. 50 at 35-38.  Both grievances were denied without anyone other than Lt. Moyer allegedly reviewing the materials seized from Mr. Griffin-El.  Ex. 50 at 35-39; Ex. 14.

While he was still in the hole for the alleged misconduct, Mr. Griffin-El handwrote the original Complaint (Docket No. 1) on the floor of his cell and filed this lawsuit on June 22, 2006. Even after this lawsuit was filed – indeed, to this very date – Defendants have not given Mr. Griffin-El an opportunity to review all of the materials seized from him and they have not returned a single item to Mr. Griffin-El.

Defendants did not make a list of the items seized from Mr. Griffin-El on August 4, 2005 until after this lawsuit was filed.  Ex. 14.  This list was prepared with the assistance of counsel for Defendants, Beth Smith, Esquire.  Ex. 6 at 165-66; List of Materials that May be Returned, attached hereto as Ex. 53; List of Materials Not to Be Returned, attached hereto as Ex. 54.  This list, however, includes items that clearly belong to other inmates.  For example, the list includes items that belong to inmates Claybourne Rasheed Frazier and Duane Keith Wykoff.[3]  Id. Strikingly, the list prepared for Mr. Frazier is almost identical to the list prepared for Mr. Griffin-El.  By way of further example, the list also contains references to "green sheets."  Exs. 53-54. A green sheet reflects a decision of the Parole Board and are only for inmates who are eligible for parole.  Ex. 9 at 24-26.  Mr. Griffin-El was not eligible for parole and had no green sheets. Still further, the list does not include the floppy disk that Lt. Moyer testified was the primary purported reason for subjecting Mr. Griffin-El to the May 5, 2006 strip search, seizure, and subsequent disciplinary action.  Exs. 53-54.

---

[3]     Both of these inmates were also targets of the August 4, 2005 search and seizure.  Ex. 7. Mr. Frazier was a plaintiff in the Monroe litigation, and defendants and their counsel in that matter prepared an inventory list for Mr. Frazier's seized items.  See Monroe v. Beard, No. 05-04937 (E.D. Pa.).

### G.      Defendants Refused to Produce Documents to Mr. Griffin-El During Discovery.

Mr. Griffin-El served Defendants with written discovery in this lawsuit, including four sets of Interrogatories and three sets of Requests for Production of Documents.  He specifically requested the production of "**[a]***ll* documents seized by the Prison during the August 4, 2005 search of Plaintiff's person and his cell" and "**[a]***ll* documents seized by the Prison during the May 5, 2006 search of Plaintiff's person and his cell."  Plaintiff's First Set of Request for Production Nos. 12, 18, attached hereto as Ex. 55 (emphasis added).[4]  In addition, Mr. Griffin-El specifically requested the production of "**[a]***ll* documents concerning the August 4, 2005 search of Plaintiff's person and his cell conducted by the Prison" and "**[a]***ll* documents concerning the May 5, 2006 search of Plaintiff's person and his cell conducted by the Prison."  Ex. 55 Nos. 11, 17 (emphasis added).

Defendants refused to produce any seized documents, taking the position that they were irrelevant to this case.[5]  Defendants' Response to Request for Production No. 12, attached hereto as Ex. 56.  Accordingly, Plaintiff was forced to seek the Court's intervention.  See February 5, 2009 letter from W. John Lee to The Honorable L. Felipe Restrepo, attached hereto as Ex. 57.  After conducting a telephone conference with counsel, this Court ordered Defendants to produce: "*[a]ll* documents seized from Plaintiff's possession during the two searches identified in the complaint, dated 8/4/2005 and 5/5/2006."  Order dated February 10, 2009 (Docket No. 68) ¶ 1.

---

[4]      The definitions in Plaintiff's First Request for Production specifically defined "documents" to include both "computer or electronic storage device, including diskettes" and "video and/or audio recordings."  Ex. 55 at 1-2.

[5]      In addition to asserting irrelevance objections, Defendants have asserted several other grounds for refusing to produce documents.  For example, Defendants claimed that Plaintiff's own medical records were "confidential for security reasons," privileged under state law, or protected by the deliberative process privilege.  Defendant's Motion for Reconsideration (Docket No. 69); April 28, 2009 letter from Beth Anne Smith (Docket No. 86).  This Court rejected these arguments by Order dated June 8, 2009 (Docket No. 107).

Defendants, however, continued to refuse to produce the seized materials. On March 31, 2009, Mr. Griffin-El was forced to seek the Court's intervention again. March 31, 2009 letter from W. John Lee to The Honorable L. Felipe Restrepo, attached hereto as Ex. 58. After conducting another telephone conference with counsel, this Court again ordered Defendants to produce these documents. Order dated April 6, 2009 (Docket No. 81) ¶ 1.

On April 7, 2009, nearly four years after the documents were seized from Mr. Griffin-El, Defendants made available several boxes of documents – which Defendants represented contained all of the items seized from Mr. Griffin-El – to Mr. Griffin-El's counsel for inspection and copying at SCI Graterford. Affidavit of Rachael Hirshenhorn, attached hereto as Ex. 59; Affidavits of Andrew Schroder, attached hereto as Ex. 60.

Significantly, the materials that were produced to Mr. Griffin-El's counsel did not include the floppy disk that Lt. Moyer admits was seized from Mr. Griffin-El on August 4, 2005 – or several other items – including, but not limited to, Mr. Griffin-El's "ten years worth of research notes, prepared legal strategies in the form of notes and draft briefs and memorand[a] to the courts;" the "medical records associated with [his] claims;" or the videotape recordings of the area immediately outside of Mr. Griffin-El's cell from both searches and seizures. Ex. 1 at 50.

Furthermore, the materials produced by Defendants contained several items that did not belong to Mr. Griffin-El and were not in his possession on either August 4, 2005 or May 5, 2006. As noted above, Defendants' production contained materials that belonged to other inmates that were subjected to the August 4, 2005 searches and seizures, and also contained green sheets for inmates who, unlike Mr. Griffin-El, were eligible for parole. Exs. 53-54.

In an effort to determine what, if any, efforts Defendants had made to preserve evidence, Mr. Griffin-El requested that this Court compel Defendants to identify any litigation hold

memoranda they had received.  See July 21, 2009 letter from W. John Lee to The Honorable L.

Felipe Restrepo (Docket No. 120).  This Court responded by directing Defendants to "identify

the existence of litigation hold memoranda or documents, the sender, and the date any such

documents were received.  The litigation hold documents themselves and the contents of said

documents are not discoverable *absent a showing of spoliation on the part of Defendants*."

Order dated August 25, 2009 (Docket No. 136) (emphasis added).

In response to this Order, several Defendants, including Lt. Moyer, Superintendent

DiGuglielmo, and Deputy Lorenzo, among others, identified August 7, 2006 as the date when

they received litigation hold memoranda from their counsel.  See Defendants' Response Pursuant

to Court's Order of August 26, 2009, attached hereto as Ex. 61.

Defendants relied on the floppy disk in formulating their discovery and trial strategy.

Indeed, Defendants include a discussion of the floppy disk in Defendants' First Set of Requests

for Admissions dated April 28, 2009.  See Defendants' Requests For Admissions Nos. 26-28,

attached hereto as Ex. 62.  In addition, during Lt. Moyer's deposition, which took place on June

26, 2009, Lt. Moyer admitted that the floppy disk was in his possession and even admitted that

he was able to review some of the contents of the floppy disk.  Ex. 6 at 188-91.

On July 2, 2009**,** Defendants took the position that "Defendants cannot give [Mr. Griffin-

El's counsel] the original floppy disk . . . [but] [Mr. Griffin-El's counsel] may view the contents

of the disk at Graterford in the presence of Lt. Moyer and [Defendants' counsel] at a mutually

convenient date and time."  See July 2, 2009 e-mail from B. Smith to J. Lee, attached hereto as

Exh. 63.  During the deposition of Defendant Wendy Shaylor on July 16, 2009, conducted at SCI

Graterford as a courtesy to Ms. Shaylor, counsel "agreed to make [the floppy disk] available to

[Plaintiff's counsel] for inspection at [Lt.] Moyer's office and to printout all information that

[was] available on the disk.  [Plaintiff's counsel] will agree to this solution, subject to a written representation that Defendants will notify [Plaintiff and his counsel] in the event that [Defendants] are able to access any additional information from the floppy disk after the date of Plaintiff's inspection and to share this information with counsel for Plaintiff."  Ex. 33.

Plaintiff's counsel offered several dates to Defendants' counsel to come to SCI Graterford and inspect the floppy disk.  August 18, 2009 e-mail chain between B. Smith and J. Lee, attached hereto as Ex. 64.  As of August 18, nearly one month later, Defendants still had not made the floppy disk available for inspection.  Id.  On August 20, 2009, counsel for Defendants advised that "[t]he floppy disk, unfortunately, cannot be located at present.  Should it turn up in the interim, you may review that as well."  August 20, 2009 e-mail from B. Smith to J. Lee, attached hereto as Ex. 65.  Since then, discovery closed for the additional Defendants on November 30, 2009, and Defendants have failed to produce the floppy disk.

Because Defendants have lost or destroyed relevant evidence, and for the reasons set forth below, this Court should grant Mr. Griffin-El's Motion for Sanctions Based on Defendants' Spoliation of Evidence.

III.    **ARGUMENT**

A.    **Standard for Spoliation of Evidence.**

The law on spoliation of evidence and the adverse inference to be drawn from the loss or destruction of documents is well established in the Third Circuit.  See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995).  Spoliation "is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  Ogin v. Ahmed, 563 F. Supp. 2d 539, 542 (M.D. Pa. 2008) (internal citation and quotations omitted).  The Supreme Court has recognized that the district courts may impose sanctions for spoliation as part of their inherent power.  See Scott v. IBM Corp., 196 F.R.D. 233, 249 (D.N.J. Sep. 27, 2000) (citing Chambers v. NASCO, Inc., 501 U.S. 32 (1991)).

A court may impose a range of sanctions for spoliation, including: (1) dismissal of a claim or granting judgment in favor of a prejudiced party; (2) suppression of evidence; (3) an adverse inference, referred to as the spoliation inference; (4) fines; and (5) attorneys' fees and costs.  Ogin, 563 F. Supp. 2d at 545 (internal citation omitted).  Here, the entire range of sanctions, from the spoliation inference to judgment in favor of Mr. Griffin-El, should be considered, and the appropriate sanction is dependent on the contents of any litigation hold memoranda that Defendants received.

Where, as here, a party spoliates evidence, courts have admitted spoliation evidence, or evidence showing that the party destroyed evidence relevant to the dispute, and found that spoliation evidence permits an adverse inference that the destroyed evidence would have been unfavorable to the offending party.  Schmid v. Milwaukee Elec. Tool Corp., 13 F.3d 76, 81 (3d Cir. 1994).  The admissibility of spoliation evidence and the adverse inference are well established in this jurisdiction.  Id.; Brewer, 72 F.3d at 334.  The evidentiary rationale for the

24

spoliation inference is based on common sense and is well established in this Circuit: "a party who has notice that evidence is relevant to litigation and who proceeds to destroy evidence is more likely to have been threatened by that evidence than is a party in the same position who does not destroy the document." <u>Schmid</u>, 13 F.3d at 78 (internal quotations omitted); <u>accord</u> <u>Brewer</u>, 72 F.3d at 334.

The adverse inference for spoliation applies where, as here, "(1) the evidence in question [was] within the party's control; (2) . . . there has been an actual suppression or withholding of the evidence; (3) the evidence destroyed or withheld was relevant to claims or defenses; and (4) it was reasonably foreseeable that the evidence would later be discoverable." <u>Ogin</u>, 563 F. Supp. 2d at 543 (internal citations omitted).  For the reasons set forth below, there is no question that the adverse inference applies to Defendants' spoliation of the seized items and the video recordings.

### B.  <u>Defendants Lost Or Destroyed Items That Were Seized From Mr. Griffin-El.</u>

#### 1.  *Defendants Had Exclusive Control Of All Of The Items Seized From Mr. Griffin-El.*

It is undisputed that all of the items seized from Mr. Griffin-El, including his legal materials relating to his PCRA petition and the floppy disk that allegedly motivated the May 5, 2006 search and seizure, were at all times exclusively in Defendants' control.

#### 2.  *Defendants Failed To Produce All Of The Items That Were Seized From Mr. Griffin-El.*

Mr. Griffin-El specifically requested that Defendants produce:"*[a]ll* documents seized by the Prison during the August 4, 2005 search of Plaintiff's person and his cell" and "*[a]ll* documents seized by the Prison during the May 5, 2006 search of Plaintiff's person and his cell." Plaintiff's First Set of Request for Production Nos. 12, 18 (emphasis added).  Moreover, this Court specifically ordered Defendants to produce "*[a]ll* documents seized from Plaintiff's

possession during the two searches identified in the complaint, dated 8/4/2005 and 5/5/2006."
Order dated February 10, 2009 (Docket No. 68) ¶ 1 (emphasis added).

Yet, Defendants failed to comply with this Order and failed to produce ***all*** of the
documents that were seized from Mr. Griffin-El during these two searches.  Specifically,
Defendants admit that at least one document that was seized on August 4, 2005 and was in their
exclusive control since then – the floppy disk – has been lost or destroyed.  In addition,
Defendants have not produced the approximately "ten years worth of research notes, prepared
legal strategies in the form of notes and draft briefs and memorandums to the courts" and
"medical records associated with [Mr. Griffin-El's PCRA] claims" that were also seized on
August 4, 2005 and were in their exclusive control since then.  Ex. 1 at 50.

### 3.    *The Items Seized From Mr. Griffin-El Are Relevant To His Claims.*

The floppy disk is relevant evidence.  Lt. Moyer admits that the floppy disk was the
primary reason why he ordered the May 5, 2006 search and seizure.  Mr. Griffin-El argues that
the May 5, 2006 search and seizure and subsequent discipline he received as the purported result
of this search and seizure were in retaliation for his numerous requests for the return of his legal
materials.  Furthermore, Defendants included a discussion of the floppy disk in Defendants' First
Set of Request for Admissions dated April 28, 2009.  Indeed, Defendants refused to produce the
floppy disk to Plaintiff's counsel for copying and inspection for the alleged fear that it would be
lost or altered in some way.

Defendants cannot credibly deny that Mr. Griffin-El's legal materials relating to his
PCRA petition are relevant to this case.  Indeed, these documents – and Defendants' failure to
return them to Mr. Griffin-El – are the crux of this lawsuit.  Yet, they have failed to produce an
accurate or credible inventory or copy of all of the seized items.

**4.      *It Was Reasonably Foreseeable That All Of The Items Seized From Mr.
Griffin-El Would Be Discoverable.***

A "litigant is under a duty to preserve evidence which it knows or reasonably should

know is relevant to the action."  Baliotis v. McNeil, 870 F. Supp. 1285, 1290 (M.D. Pa. 1994)

(internal quotations and citations omitted).  This duty arises where there is knowledge "of the

existence or likelihood of litigation."  Id. (internal quotations and citations omitted).

Defendants knew, or should have known, that they had a duty to preserve the seized

items as early as August 9, 2005, when Mr. Griffin-El sent his first inmate request to

Superintendent DiGuglielmo.  See Ogin, 563 F. Supp. 2d at 543-44 (holding that defendants

received notice of potential litigation when they received letter from plaintiff's counsel).  Indeed,

in this inmate request, Mr. Griffin-El put Defendants on notice of potential litigation when he

informed them that the "seizures were tactics of intimidation and harassment employed against

me in response to my lawful and legal pursuit of freedom, justice and access to the courts."  Ex.

18 at 2; see Scott, 196 F.R.D. at 249 (holding that litigation was reasonably foreseeable when

plaintiff in employment discrimination was terminated as part of reduction in force because

defendant had "ample notice that it was discharging a potentially litigious employee" as plaintiff

had made previous claims of discrimination).

Indeed, several events shortly after August 9, 2005 further highlighted the significance of

Defendants' duty to preserve this evidence.  On October 17, 2005, several inmates filed a lawsuit

challenging the constitutionality of the August 4, 2005 UCC searches and seizures and the UCC

policy itself.  Monroe v. Beard, No. 05-04937 (E.D. Pa.).  Thus, all of the items seized during the

August 4, 2005 UCC search should have been preserved.  In addition, Mr. Griffin-El began the

litigation process by pursuing his administrative remedies, as required by the PLRA, by filing

two grievances in May 2006 challenging both searches and seizures.  Woodford v. Ngo, 548 U.S.

81, 95 (2006) (discussing PLRA exhaustion requirement and finding that "[w]hen a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and ***evidence can be gathered and preserved***." (emphasis added)).  Mr. Griffin-El filed the original complaint in this lawsuit on June 22, 2006.  As of August 7, 2006, Defendants' duty to preserve should have been dispelled beyond any and all doubt as they admit that they received litigation hold memoranda from their counsel on this date.  See Ex. 61.

## C.   Defendants Destroyed The Video Recordings Of The Two Searches And Seizures.

Lt. Moyer admits that it is prison protocol to save surveillance video tapes for at least 90 days following their creation. Ex. 6 at 208:12-13.  Mr. Griffin-El specifically requested the production of "**[a]ll** documents concerning the August 4, 2005 search of Plaintiff's person and his cell conducted by the Prison" and "**[a]ll** documents concerning the May 5, 2006 search of Plaintiff's person and his cell conducted by the Prison."  Ex. 55 (emphasis added).

As of August 9, 2005, just four days after the initial search and seizure, Defendants knew or should have known of their duty to preserve documents regarding the UCC searches the events surrounding them.  Further still, the filing of the Monroe litigation should have removed all doubt.  Yet, Defendants admit that the video recordings of the August 4, 2005 and May 5, 2006 searches and seizures have been destroyed.  See Ex. 33; see also August 27, 2009 e-mail from B. Smith to J. Lee, attached hereto as Ex. 66.

The video recording of the August 4, 2005 contained relevant evidence as it may have shown what items were seized from Plaintiff beyond "2 boxes" and "1 bag."  See Centimark Corp. v. Pegnato & Pegnato Roof Mgmt., Inc., No. 05-708, 2008 WL 1995305 (W.D. Pa. May 6, 2008) (finding that where documents no longer exist, a party "needs only to come forward with

plausible, concrete suggestions as to what the [lost] evidence might have been." (internal citation and quotations omitted)). Indeed, it may have identified who actually wrote "2 boxes" and "1 bag." It may have confirmed what items were seized. In addition, it may have shown that the strip search of Mr. Griffin-El was not conducted reasonably in violation of the Fourth Amendment. Furthermore, it would have confirmed, at the very least, that Defendants Thomas and Scarpati were involved in this search, as both COs could not recall whether they were involved in the search. Ex. 3 at 88; Ex. 5 at 17-18, 23, 36-37.

Similarly, the video recording of the May 5, 2006 search and seizure also contained relevant evidence for the same reasons. See Docket Entry No. 1. In addition to these reasons, the destroyed video recording would have identified the third CO who participated in the May 5, 2006 search and seizure.

### D.   At A Minimum, The Spoliation Inference Is An Appropriate Sanction.

To determine what level of sanctions to impose, the court should consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." Ogin, 563 F. Supp. 2d at 545 (citing Schmid, 13 F.3d at 79).

### 1.   *Defendants Willfully Spoliated Relevant Evidence.*

Defendants admit that they seized documents and other items from Mr. Griffin-El on August 4, 2005. Mr. Griffin-El testified that at the time of the search, he had "accumulated at least ten years worth of research notes, prepared legal strategies in the form of notes and draft briefs and memorandums to the courts. There were medical records associated with my claims,"

all of which were seized by Defendants on August 4, 2005.  Ex. 1 at 50.  There is no credible

dispute to this testimony.

Defendants had exclusive custody and control of all of the seized items.  Yet, the only

contemporaneous document reflecting what was seized from Mr. Griffin-El on August 4, 2005

merely states that "2 boxes" and "1 bag" were seized.  Just five days after the initial seizure, Mr.

Griffin-El complained that the confiscated items receipt he received after the August 4, 2005

seizure "[did] not provide an accurate and true accounting of the numerous affidavits, evidence

in the form of legal and official documents, petitions, case law, records, medical records,

bank/credit union Statements of Account, tax records, bills, receipts/proof of purchase, legal

reference books, literature, personal letters, religious material, legal strategy in the form of

personal notes, inmate handbook – rules and regulations of the DOC, Durable Power of

Attorneys, and other items."  Ex. 18 at 1-2.

Defendants ignored Mr. Griffin-El's requests for an accounting and their own procedures

as outlined in the Lorenzo Memorandum.  Indeed, Defendants did not prepare a purported list of

the items seized from Mr. Griffin-El until after this lawsuit was filed, or approximately one year

after the initial seizure.  Furthermore, despite the fact that the Lorenzo Memorandum provided a

specific procedure for the immediate review and return of "unwittingly confiscated" legal

materials, and Superintendent DiGuglielmo's admission that Mr. Griffin-El should have received

two opportunities to review all of the seized items, Mr. Griffin-El never received one.

The response that Mr. Griffin-El received to his numerous requests for an accurate

accounting of the seized items and for the return of his legal materials, however, was an

interrogation about the contents of the floppy disk, a strip search, a second search and seizure of

his cell on May 5, 2006, and a misconduct that resulted in ninety days in the hole, the loss of his prison job, an increased custody level, and the loss of his single cell status.

Lt. Moyer alleges that the primary motivation for the May 5, 2006 search was Mr. Griffin-El's refusal to provide the password for the floppy disk that was seized on August 4, 2005, a portion of the contents of which Lt. Moyer admits viewing. Ex. 6 at 186-91. It is disingenuous for Defendants – in light of Lt. Moyer's fanfare over this floppy disk, its existence, its alleged effect on several Defendants, and its purported contents during the interrogation of Mr. Griffin-El, particularly after his boss, Superintendent DiGuglielmo, had asked him repeatedly to review Mr. Griffin-El's seized materials; during the misconduct proceeding; and during discovery in this case – to now claim that the floppy disk "cannot be located" and fail to produce it.

Even after Mr. Griffin-el filed this lawsuit, Defendants disregarded his requests for documents, including the disk, even when the request were made through formal discovery by counsel and even when directed to do so by Orders from this Court. See Scott, 196 F.R.D. at 248 (finding that spoliation sanctions are warranted where documents were knowingly destroyed after the filing of the complaint or where, as here, "they 'disappear' after a court order for their production.").

Defendants admit that the floppy disk, which was in their control after August 4, 2005, "cannot be located." Lt. Moyer admitted in his deposition, which took place after the Court ordered Defendants to produce the floppy disk, that he had the floppy disk in his possession. Ex. 6 at 188-91. In addition, Defendants have not produced the approximately "ten years worth of research notes, prepared legal strategies in the form of notes and draft briefs and memorandums to the courts" and "medical records associated with [Mr. Griffin-El's PCRA] claims" that were

also seized on August 4, 2005 and were in their exclusive custody since then.  Nor have

Defendants produced an accurate or credible list of what was seized.  The list that they created

almost a year after the initial search and seizure does not contain a reference to the floppy disk,

which they admit they seized on August 4, 2005, or the numerous documents listed by Mr.

Griffin-El just days after the seizure, *but* it does include numerous items that don't belong to Mr.

Griffin-El.  The spoliation inference, at a minimum, is, therefore, an appropriate sanction for

Defendants' failure to produce all of the seized materials.  See Dowling v. United States Gov't,

No. 2000-0049, 2008 WL 4534174, at *2 (D.V.I. Oct. 6, 2008) (finding spoliation inference

appropriate where government had notice that spoliated evidence was relevant but failed to take

reasonable precautions to preserve it).

Similarly, with respect to the video recordings, Defendants admit that they were

destroyed.  The video recording of the August 4, 2005 search and seizure, which Defendants

admit were usually kept for 90 days, should have been preserved for this litigation because,

Defendants should have known that litigation was foreseeable as of August 2005.  Indeed, they

had notice of pending litigation as of October 17, 2005, and the Monroe litigation did not close

until December 1, 2008.

Defendants' destruction of the video recordings of the May 5, 2006 search and seizure is

even more culpable.  Mr. Griffin-El filed the grievances in order to exhaust his administrative

remedies in May 2006, thereby putting Defendants on notice of potential litigation.  He filed his

original complaint on June 22, 2006.  Although the video recording should have been preserved,

Defendants admit that it was destroyed.

### 2.   *Mr. Griffin-El Has Been Severely Prejudiced By Defendants' Spoliation of Evidence.*

The prejudice to Mr. Griffin-El from Defendants' spoliation of evidence is significant. Defendants' seizure of Mr. Griffin-El's legal materials on August 4, 2005 resulted in the dismissal of his PCRA petition and, along with it, severely reduced his hopes of winning his fight to have his life sentence modified.  To compound this violation of Mr. Griffin-El's constitutional right of access to the courts, Defendants' grossly negligent record keeping – including the failure to prepare an accurate accounting of the seized items as repeatedly requested by Mr. Griffin-El and the failure to provide him with the opportunity to review the seized items as required by the Lorenzo Memorandum – has now resulted in the spoliation of evidence that Mr. Griffin-El needs to vindicate the violation of his civil rights and to rebut Defendants' allegations regarding the contents of the floppy disk as forming the basis for the retaliatory actions of May 5, 2006.

Furthermore, Defendants claim that the May 5, 2006 search and seizure and resulting misconduct and discipline were based on Lt. Moyer's review of the floppy disk.  Yet, this floppy disk and the video recording of the May 5, 2006 search and seizure, which reflected who conducted the search and seizure and what was taken out of Mr. Griffin-El's cell, are not available to Mr. Griffin-El due to Defendants' actions and lack of preservation efforts. Accordingly, Defendants should not be permitted to claim that the retaliatory events that took place after the May 5, 2006 interrogation by Lt. Moyer concerning the floppy disk were due to any legitimate penological interest.

With respect to the video recordings, Mr. Griffin-El has been prejudiced as the recordings would have confirmed the identities of the individuals who conducted the searches, the identity of the third CO who participated in the May 5, 2006 search and seizure, and the identity of the

person who wrote "2 Boxes" and "1 Bag."  In addition, they may have shown what, in fact, was seized from Mr. Griffin-El during both searches and seizures and how those searches and seizures were conducted.

"When considering the degree of prejudice suffered by a party that did not destroy the evidence, the court should take into account whether that party had a meaningful opportunity to examine the evidence in question before it was destroyed." In re Wechsler, 121 F. Supp. 2d 404, 416 (D. Del. 2000) ("When one side is completely deprived of the opportunity to inspect the evidence because it was destroyed after the other side had a chance to examine it, then sanctions for spoliation are generally appropriate.").  That test is automatically satisfied here: neither Mr. Griffin-El nor his attorney's were provided with an opportunity to review or inspect the floppy disk, the surveillance video recordings of the two searches and seizures, or all of the items seized from Mr. Griffin-El, including his legal materials.  See id. ("Of course, when a party is denied any opportunity to examine the evidence, this test would automatically be satisfied."); Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 112 (E.D. Pa. 2005) (finding Plaintiff prejudiced by Defendant having wiped computer's hard-drive clean); Williams v. Am. Surplus, Inc., No. 02-7655, 2003 WL 22232882, at *3 (E.D. Pa. Aug. 4, 2003) (explaining defendant "severely prejudiced" by inability to inspect actual gate that cause accident; plaintiff's claim dismissed as sanction); Erie Ins. Exch. ex rel. McCracken v. Applica Consumer Prods., Inc., No. 02-1040, 2005 WL 1165562, at *5 (M.D. Pa. May 17, 2005) (holding defendant prejudiced by being unable to test bases of plaintiff's assertions due to destruction of evidence).

**3.**      ***Sanctions Are Necessary To Avoid Substantial Unfairness To Mr. Griffin-El.***

Spoliation sanctions serve three functions: (1) "a remedial function by leveling the playing field or restoring the prejudiced party to the position [in which] it would have been

without spoliation;" (2) "a punitive function, by punishing the spoliator for its actions;" and (3) "a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be." <u>Mosaid Techs., Inc. v. Samsung Elecs. Co.</u>, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).

Due to the level of Defendants' misconduct and the degree of prejudice suffered by Mr. Griffin-El, no sanction lesser than judgment for Mr. Griffin-El will adequately serve these three functions. Only judgment for Mr. Griffin-El will send a clear message to prison officials that they cannot avoid liability in prisoner civil rights actions by destroying or losing relevant evidence. Indeed, there is no more lopsided balance of power than in the context of prisoner civil rights actions where prison officials – government actors charged with the custody and care of inmates and their constitutional rights  – have complete and total control of the evidence that inmates need to prove that the prison officials violated this very charge.

For litigation and discovery to have any meaningful value in prisoner civil rights actions (and, by implication, the United States Constitution), the duty for prison officials to preserve evidence must begin at the moment that the inmate files an administrative grievance as required by PLRA as a prerequisite to filing a lawsuit. Otherwise, prison officials can conveniently lose or destroy relevant evidence that is in their exclusive custody and control while the inmate is forced by the PLRA to exhaust their administrative remedies prior to seeking judicial relief. Indeed, the Supreme Court has recognized that "When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and ***evidence can be gathered and preserved***." <u>Woodford v. Ngo</u>, 548 U.S. 81, 95 (2006) (emphasis added) (discussing PLRA exhaustion requirement).

Mr. Griffin-El's fate illustrates this point.  Here, Defendants forced Mr. Griffin-El to use written inmate requests and strung him along until May 5, 2006 while they conducted a purported investigation into the documents that were seized from him on August 4, 2005.  As Defendants admit, however, they did not even finishing reviewing the items that were seized from Mr. Griffin-El until nearly a year later, after Mr. Griffin-El filed the complaint in this lawsuit.  During this year, while Mr. Griffin-El patiently waited for a response to his numerous written requests, several key pieces of evidence were destroyed and lost – the video recordings of the two searches and seizures and many of his legal materials.  Indeed, even after Mr. Griffin-El filed grievances in May 2006 relating to the searches and seizures that form the basis for this lawsuit, Defendants destroyed the video recording of the second search and seizure.

But Defendants' disregard for the significance of evidence and Mr. Griffin-El's constitutional rights did not end there.  Indeed, even after receiving two Orders from this Court to produce all of the items seized from Mr. Griffin-El, Defendants failed to do so and admit that the floppy disk – which Defendants admit was seized from Mr. Griffin-El and was in their custody after the Court issued the two Orders directing them to produce it – is now missing.  Also missing is a significant amount of the legal materials seized by Defendants that Mr. Griffin-El needed to fight his life sentence.  Such flagrant disregard for the Constitution, integrity of a federal court, and the Federal Rules of Civil Procedure should not be countenanced, and only judgment for Mr. Griffin-El satisfies the punitive function of spoliation sanctions.

Still further, Mr. Griffin-El cannot be made whole without judgment.  Although Mr. Griffin-El requests, in the alternative to judgment, spoliation evidence and an adverse inference instruction, the reality is that he is an inmate who is fighting a life sentence.  Without the evidence that Defendants spoliated, including all of the legal documents that were seized during

36

the two searches and seizures, he will be severely prejudiced in his ability to convince a jury for a verdict, even with the benefit of spoliation evidence and an adverse inference instruction.

If this Court, however, finds that judgment is not warranted, then at the very least Mr. Griffin-El should be granted spoliation evidence and an adverse inference instruction the spoliation inference in order to avoid substantial unfairness. Indeed, "the spoliation inference is regarded as a 'far lesser sanction,' and is intended to level the playing field between the parties." Telequest Int'l Corp, v. Dedicated Bus. Sys., Inc., No. 06-5359, 2009 WL 690996, at *3 (D.N.J. Mar. 11, 2009); accord Baliotus, 870 F. Supp. at 1292 (finding that "lesser sanction" of spoliation inference was appropriate); Canton v. Kmart Corp., No. 05-143, 2009 WL 2058908, at *3 (D.V.I. July 13, 2009) (finding that the Third Circuit characterized the adverse inference as a "lesser sanction" for spoliation.).

All three of the functions underlying spoliation sanctions warrant sanctions in the form of spoliation evidence and an adverse inference instruction. These sanctions are necessary to make Plaintiff whole, to punish Defendants – who are state actors charged with the care of inmates and their constitutional rights – for repeatedly failing to preserve evidence relevant to an inmate's constitutional claims. Furthermore, these sanctions further serve as a deterrent because they send a clear message to prison officials that they cannot avoid liability in civil rights actions by simply destroying or losing evidence of their unconstitutional acts in direct violation of two Court Orders. See, e.g., Ogin, 563 F. Supp. 2d at 546 (finding that "an adverse inference is designed to deter similar conduct in future cases").

**IV.**    <u>**CONCLUSION**</u>

For the reasons set forth above, Mr. Griffin-El respectfully requests that this Court grant

Plaintiff's Motion for Sanctions Based on Defendants' Spoliation of Evidence.


Respectfully submitted,

December 18, 2009


/s/ W. John Lee
Larry L. Turner (ID # 48351)
W. John Lee (ID # 206796)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5017/5084/5210

*Attorneys for Plaintiff,*
*K. Kabasha Griffin-El a/k/a*
*Keith Fedele Griffin*